AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)       ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
Central District of California

LODGED
CLERK, U.S. DISTRICT COURT
09/01/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: _____DVE_____ DEPUTY

FILED
Sept 1, 2021
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION AT SANTA ANA
BY  Nancy Boehme
Deputy Clerk, U.S. District Court

United States of America

v.

Michael Young Park,

Defendant.

Case No. 8:21-mj-00597-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of April 7, 2021, in the county of Orange in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1), (b)(1)(A) | Possession with Intent to Distribute At Least 500 Grams of Methamphetamine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Farshid Hashempour
Complainant's signature

Farshid Hashempour, Task Force Officer (FBI)
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: September 1, 2021

City and state: Santa Ana, California

**DOUGLAS F. McCORMICK**
Judge's signature

Douglas F. McCormick, U.S. Magistrate Judge
Printed name and title

RW:hc

**A F F I D A V I T**

I, Farshid Hashempour, being duly sworn, hereby declare and state as follows:

### I. INTRODUCTION

1. I am a Detective with the Santa Ana Police Department ("SAPD") and also a federally deputized Task Force Officer ("TFO") presently working with the Federal Bureau of Investigation ("FBI"). As a TFO with the FBI, I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and I am empowered by law to conduct investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516.

2. I am assigned to the Orange County Violent Gang Task Force ("OCVGTF"). The OCVGTF is composed of federal and local law enforcement agencies, including, but not limited to, the FBI, the SAPD, and the Anaheim Police Department. The OCVGTF is responsible for, among other things, investigating violations of federal law committed by criminal street gangs, the Mexican Mafia, and other violent criminal organizations in Orange County. Prior to this assignment with the FBI, I was a SAPD police officer and have been so employed for approximately twenty years.

3. I have specialized training and experience in investigations of narcotics trafficking and criminal street gangs. During my tenure as a police officer, as well as an FBI TFO, I have conducted and participated in numerous investigations of narcotics trafficking and violent offenses

committed by street gangs.  Since joining the OCVGTF in 2010, I have specialized in investigations of the Mexican Mafia and its subordinate gangs in Orange County.  As part of these investigations, I have also learned about the drug trafficking organizations that supply street gangs with illegal narcotics.

## II. PURPOSE OF AFFIDAVIT

4.    This affidavit is made in support of a criminal complaint and arrest warrant against MICHAEL YOUNG PARK ("PARK") for a violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(A)(viii) (Possession with Intent to Distribute Methamphetamine).

5.    The facts set forth in this affidavit are based upon information obtained from other law enforcement personnel, my personal knowledge, and my training and experience.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III. SUMMARY OF PROBABLE CAUSE

6.    On April 7, 2021, after responding to a call for service at the Radisson Hotel, Buena Park Police Department ("BPPD") officers found methamphetamine in a room registered to PARK.  PARK was located in a different room, also registered to him, in the same hotel.  A search of the second room pursuant to a state search warrant uncovered various controlled substances,

including methamphetamine, fentanyl, and heroin.  In a Mirandized statement to officers, PARK admitted that he was selling controlled substances to pay off an existing drug debt.

7.   On August 21, 2021, SAPD detectives conducted a probable cause search of a vehicle parked at the Comfort Inn in Santa Ana.  PARK was the front passenger of the vehicle.  In a briefcase found on the rear passenger seat, the detectives discovered numerous substances believed to be methamphetamine, fentanyl, heroin, cocaine, oxycodone and Xanax.  Also in the briefcase were three digital scales, $3,160 in cash, and a piece of mail forwarded to PARK.  PARK later admitted to detectives that he was a drug dealer, and that the narcotics in the briefcase belonged to him.

## IV. STATEMENT OF PROBABLE CAUSE

8.   I have reviewed the police reports prepared by BPPD Patrol Corporal C. Nyhus and SAPD Detective J. McKee, who were involved in the arrests of PARK on April 7, 2021, and August 21, 2021, respectively.  Based on my review of those reports and my communication with Detective McKee, I have learned the following facts:

### A.   Arrest of PARK on April 7, 2021

9.   On April 7, 2021, at around 2:56 p.m., BPPD Cpl. Nyhus was working uniformed patrol when he was dispatched to the Radisson Hotel at 7762 Beach Boulevard, Buena Park, California, because a hotel employee had found controlled substances in one of the hotel rooms.  Cpl. Nyhus spoke to the general manager, Jose Peralta, who explained that the guests in Room 233 were

3

scheduled to vacate the room earlier that same day. Believing they had already vacated the room, housekeeping staff entered to conduct a cleaning. After entering, housekeeping noticed a large amount of personal property, including clothing, food, and other items. They also observed what appeared to be methamphetamine and devices used to ingest controlled substances. Peralta secured the room and contacted BPPD.

10. Cpl. Nyhus noticed a clear baggie containing a white crystalline substance on a nightstand separating the two beds in Room 233. Based on his training and experience, he recognized this substance as methamphetamine. Inside the room safe, he found numerous empty Ziploc bags.

11. Peralta informed Cpl. Nyhus that the room was registered to PARK, who was also renting Room 312 at the same hotel. Peralta stated that PARK was no longer a welcome guest and requested BPPD's assistance in having PARK removed from the premises.

12. Cpl. Nyhus and other BPPD officers accompanied Peralta to Room 312. When PARK opened the door, Corporal Nyhus observed a female seated at a table in the kitchen area. He also noticed movement to the rear of the hotel room, leading him to believe there were additional subjects inside the hotel room. Cpl. Nyhus drew his firearm and instructed the other occupants to come out. A total of four individuals exited the rear bathroom and bedroom areas of the hotel room.

13. One of the male occupants, Michael Radigan, had a baggie of black tar heroin, a digital scale, a hypodermic needle

containing a white liquid, and a baggie of suspected rock cocaine on his person. One of the female occupants, Shanya Calhoun, had a glass methamphetamine pipe with brown and white residue.

14. While detaining the room occupants, Cpl. Nyhus noticed a digital scale on the couch in the front room, and a clear baggie of blue circular pills, which he recognized as oxycodone, on the kitchen table. In the bedroom area, there was a baggie of a red powdery substance that he recognized as methamphetamine, and a baggie of gel capsules containing the same red powdery substance. There were two large freezer bags protruding from beneath one of the beds, each containing a large quantity of white oblong pills that he recognized as hydrocodone. On the floor of the opposite side of the same bed, there was another baggie of gel capsules containing the same red powdery substance.

15. Cpl. Nyhus spoke with PARK outside the presence of the other four occupants of the room. During this conversation, PARK was not handcuffed and was not under arrest. PARK admitted he was the registered guest for both Room 312 and Room 233, the latter of which he said was occupied by two other individuals. PARK said he was the only person who stayed in Room 312 the previous night. When questioned about the red powdery substance, PARK described this substance as "crystal meth." PARK explained that the methamphetamine had been mixed with a red powdery substance, which was some type of numbing powder. PARK told Cpl. Nyhus that there was "probably" fentanyl inside

5

the hotel room. PARK did not consent to search of his hotel room.

16. On April 7, 2021, at approximately 10:30 p.m., members of BPPD executed a state search warrant for Room 312. A large amount of controlled substances was found throughout the room, along with digital scales, packaging material, and other items related to the sales of controlled substances. The substances were later sent for laboratory analysis and determined to be 1,405 grams of methamphetamine at 99% purity; 175.7 grams of fentanyl; and 118.2 grams of heroin. Based on my training and experience, I believe that these quantities of fentanyl, methamphetamine, and heroin are amounts consistent with distribution, rather than personal use. Lab tests have not yet been completed on what appeared to be 2.12 pounds of hydrocodone pills and 10.49 ounces of alprazolam (Xanax) pills that were also seized from the room.

17. Later that day, Cpl. Nyhus advised PARK of his Miranda rights. PARK stated he understood his rights and continued with the interview. PARK admitted he was the registered guest for Room 312 and stated he had been staying in that same hotel room for the past month to a month and a half. PARK said he had a debt of approximately $30,000 to drug dealers stemming from a previous arrest several years ago. PARK said he was selling controlled substances in an effort to pay down the debt. PARK acknowledged that he purchased large quantities of methamphetamine, which he sold to other people. PARK said the most methamphetamine he ever picked up at one time was

approximately 10 pounds, and the most methamphetamine he ever sold in one transaction was approximately one pound.  PARK told Cpl. Nyhus that the red powdery substance was "molly," which is a common street term for ecstasy.  PARK said he mixed four different ingredients, including "molly" and methamphetamine, which he then placed in clear plastic gel caps to sell them. PARK said that chocolate bars that were found in the hotel room contained psilocybin mushrooms, a psychedelic drug.

   18.  During the search of PARK's hotel room, BPPD officers found, inside the nightstand drawer in Room 312, an identification card in PARK's name with a photograph of PARK. They did not find belongings indicating that the other occupants had been residing there.  PARK was placed under arrest and later booked at the Orange County Jail.  On or about April 21, 2021, PARK posted a $15,000 bond and was released from the Orange County Jail.

   **B.   Arrest of PARK on August 21, 2021**

   19.  On August 21, 2021, at approximately 3:22 p.m., SAPD Detectives McKee and Buchanan were conducting a patrol check of the 2700 block of Hotel Terrace in Santa Ana, California, a road that has numerous hotels on both sides of the street.  In the parking lot of the Comfort Inn, at 2620 South Hotel Terrace, Det. McKee observed a black Kia vehicle park.  There were two males and one female in the car.  A records check on the vehicle's license plate indicated that the Kia was registered to Luis Guerrero in Lynwood, California.

7

20. The three occupants exited the vehicle. The detectives spoke to the driver, later identified as Eduardo Carrera, and PARK, who had been sitting in the right front passenger seat. (The female had walked into the lobby of the Comfort Inn.) Det. McKee asked PARK about the owner of Kia, and PARK said it was a rental.

21. While speaking to PARK, Det. McKee could hear Carrera telling Det. Buchanan that the vehicle belonged to PARK. Det. McKee suspected PARK was lying to conceal from the police that the vehicle was stolen. Det. McKee knew that this area in Santa Ana was an area where vehicles were often stolen.

22. PARK also informed Det. McKee that he had previously been arrested for narcotic sales. Det. McKee attempted to pat down PARK for weapons, but PARK immediately became confrontational and began walking away. Det. McKee believed PARK was attempting to avoid him because PARK was concealing a weapon.

23. Det. McKee told PARK that he was going to conduct a pat-down search of PARK's person for weapons due to Det. McKee's suspicion that the Kia had been stolen. PARK then said he had a weapon in his front waistband. Det. McKee lifted the front of PARK's t-shirt, revealing a black polymer semi-automatic handgun in his front waistband. The firearm did not have any markings to identify manufacturer, model, or serial number. These firearms are commonly referred to as "ghost guns." The firearm was loaded with 9mm ammunition.

24. PARK and Carrera were detained and searched for additional weapons and contraband. Det. Buchanan located Comfort Inn room keys in both PARK's and Carrera's pants pockets.

25. Det. McKee conducted a probable cause search of the Kia and observed a large brown briefcase on the rear left passenger seat. Inside were numerous packages of a white crystalline substance resembling methamphetamine, 53 grams of a white, chalk-like substance believed to be fentanyl, eight grams of a black tar substance believed to be heroin, and numerous pills believed to be oxycodone and alprazolam. Also in the briefcase were $3,160 in cash, three digital scales, and a piece of mail that had been forwarded to PARK.

26. During the search, PARK appeared to be having a medical emergency and became unresponsive. The detectives believed that PARK was experiencing an adverse reaction to fentanyl. An opioid overdose medication was given to PARK, and he appeared to breath normally again.

27. The front desk clerk at the Comfort Inn checked the key cards found on PARK and Carrera and told detectives they were registered to Room 241 under PARK's name and the name of another male.

28. After PARK was taken to the hospital, he gave detectives written consent to search Room 241. During their search, SAPD Detectives found an AR-15 "ghost gun" loaded with 20 rounds of 5.56 ammunition, approximately nine grams of a

substance believed to be methamphetamine, 60 Suboxone tablets, and other prescription medications.

29.   PARK and Carrera were arrested and transported to SAPD.  PARK acknowledged his Miranda rights and agreed to speak to Det. McKee.  PARK stated the following:

   a.   PARK rented the room at the Comfort Inn on August 20, 2021.  In the room, Carrera showed PARK a rifle and handgun.  PARK was interested in buying the firearms from Carrera, who wanted $1,500 for the rifle and $900 for the handgun.  PARK acknowledged that his criminal history prohibited him from possessing firearms.

   b.   At approximately 2:00 p.m., Kendra, the female passenger in the Kia, called PARK and asked for a ride from the Embassy Suites because she was being harassed by several males at the hotel.  PARK grabbed the handgun for protection as he and Carrera made their way to the Embassy Suites.  PARK knew Kendra because of her involvement in fentanyl sales.  PARK said that the drugs in the briefcase were his to sell.

30.   On or about August 22, 2021, PARK posted a $30,000 bond and was released from the Orange County Jail.

### V.   PARK's Criminal History

31.   I have reviewed PARK's criminal history, which shows that PARK was convicted of the following felonies on or about the dates below:

   a.   On September 7, 2016, possession of a controlled substance for sale, in violation of California Health and Safety Code § 11378, in Orange County Superior Court, Case No.

16WF1893, for which he was sentenced to 36 months of probation and 34 days in jail;

   b. On April 11, 2019, transportation of a controlled substance, in violation of California Health and Safety Code § 11379(a), and possession of a controlled substance for sale, in violation of California Health and Safety Code § 11351, in Los Angeles County Superior Court, Case No. XSONA11022501, for which he was sentenced to 36 months of probation and 436 days in jail; and

   c. On October 24, 2019, money laundering, in violation of California Penal Code § 186.10(a), in Los Angeles County Superior Court, Case No. LACBA48085101, for which he was sentenced to two years in jail.

### VI. CONCLUSION

 32. For all the reasons described above, there is probable

//

//

cause to believe that PARK has committed a violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii) (Possession with Intent to Distribute Methamphetamine).

Attested to by the applicant
in accordance with the
requirements of Fed. R.
Crim. P. 4.1 by telephone on
this  1st  day of September 2021.

**DOUGLAS F. McCORMICK**
UNITED STATES MAGISTRATE JUDGE